**MISSISSIPPI POWER & LIGHT COMPANY, Plaintiff,**

and

**Mississippi Public Service Commission, Plaintiff-Intervenor,**

v.

**UNITED GAS PIPE LINE COMPANY, Defendant.**

**Civ. A. No. J83–0267(R).**

United States District Court, S.D. Mississippi, Jackson Division.

March 21, 1984.

**334**

Wise, Carter, Child & Caraway, Jackson, Miss., Anderson, Brown, Orn & Jones, Houston, Tex., for plaintiff.

Bennett E. Smith, Mississippi Public Service Com'n., Jackson, Miss., for plaintiff-intervenor.

Brunini, Grantham, Grower & Hewes, Jackson, Miss., for defendant.

## OPINION

DAN M. RUSSELL, Jr., District Judge.

This case is before the Court at the present time upon the motion for preliminary injunction by the plaintiff, Mississippi Power & Light Company (MP & L) and by the plaintiff-intervenor, Mississippi Public Service Commission (the Commission).

MP & L is a public utility incorporated under the laws of the State of Mississippi and engaged in the generation, transmission, and distribution of electricity principally in the western half of Mississippi, where it serves over 300,000 customers in forty-five counties. The Commission is an agency of the State of Mississippi which is charged with the statutory duty of assuring, among other things, that the rates charged by public utilities in the State of Mississippi are reasonable while providing at the same time a fair rate of return to the utilities. The defendant, United Gas Pipe Line Company (United), is an interstate natural gas transmission company incorporated under the laws of the State of Delaware and has its principal place of business in Texas. It purchases gas for sale to customers, such as MP & L, along United's pipe line system located in the states of Texas, Louisiana, Mississippi, Alabama and Florida.

Jurisdiction is vested in the Court by 28 U.S.C. § 1332. There is complete diversity of citizenship between the plaintiffs and defendant, and the matter in controversy exceeds the sum or value of $10,000.00, exclusive of interest and costs.

MP & L commenced this action on April 22, 1983. It charges United with violating the pricing provisions of a contract between MP & L and United dated December 8, 1967, as amended (herein referred to as the Agreement). MP & L alleges that United had already overcharged and col-

lected from MP & L at the time of suit in excess of $31,000,000.00 and that future overcharges, if continued, will range from one to two million dollars per month, or up to $120,000,000.00 during the remaining life of the pricing provisions of the contract (through December 31, 1987). MP & L seeks a preliminary injunction, restitution of the alleged overcharges, interest, a declaratory order, a permanent injunction and attorneys' fees. United filed an answer in which it denies that MP & L is entitled to any of the relief sought and raises certain specific defenses including bar by statute of limitations, estoppel, and laches. United has also filed a counterclaim in which it demands interest and attorneys' fees in connection with the alleged untimely payment of bills.

The Commission moved to intervene on August 31, 1983, and the United States Magistrate granted the motion. As permitted by the local rules of this Court, United filed an application for review of the Magistrate's ruling. However, this Court found that the Magistrate's order was neither clearly erroneous nor contrary to law and denied United's application.

MP & L filed its motion for preliminary injunctive relief on September 26, 1983. Under the local rules of this Court, a motion may not be filed until a hearing date has been obtained from the Court. The October 31, 1983 setting was the first date MP & L obtained to bring before the Court the preliminary injunctive relief sought in the complaint, and MP & L filed its motion upon obtaining this hearing date. United sought by motion *ore tenus* to delay this setting, but the Court declined to do so.

The Commission filed its motion for preliminary injunctive relief on October 4, 1983, immediately after the hearing in which it was allowed to intervene by the United States Magistrate but before this Court denied United's application for review of the Magistrate's ruling.

The hearing on the plaintiffs' motions for a preliminary injunction was conducted on October 31—November 2 and December 19—21, 1983. Oral argument was heard February 15, 1984. After having reviewed the evidence presented by the parties and in accordance with Fed.R.Civ.P. 52(a), the Court makes the following findings.

### GAS SALES AGREEMENT

On December 8, 1967, United and MP & L entered into the Gas Sales Agreement, under which United agreed to sell and deliver and MP & L agreed to purchase and receive large volumes of natural gas. MP & L uses the gas as fuel in generating electricity at two of its power stations in Mississippi.

Article XIV of the Gas Sales Agreement set forth the various base rates MP & L agreed to pay United for different-sized blocks of gas purchased each month. Such rates which MP & L would pay were to be adjusted up or down based on the "weighted average purchase price" per thousand cubic feet (mcf) which United paid monthly for gas purchased in the Jackson Area and in United's five other "areas" in Louisiana and Texas described in the contract.

In early 1969, United drafted and submitted to MP & L for signature an amendment to Article XIV of the December 8, 1967 contract. MP & L accepted the amendment with minor changes in the wording.[1] MP & L and United executed this amendment on April 29, 1969.[2]

The 1969 Amendment provided, generally, that the price of the gas which United sold to MP & L would be based on the

---

**1.** An interoffice Memorandum of United dated April 23, 1969 states in pertinent part: "We [United's representatives] submitted to [MP & L] a proposed amendment to our contract substituting language as to the manner in which our weighted average cost of gas will be determined.... Mr. Wilson [attorney for MP & L] requested a minor change in the wording of the agreement to which Mr. Woods [of United] is agreeable." (Exh. P–5 (Exh. 62 to Dep. of Haynes)).

**2.** Exh. P. 8: Amendatory Agreement Between United Gas Pipe Line Company and Mississippi Power & Light Company dated April 29, 1969. This amendment altered the pricing provision in Article XIV of the original contract.

average price United paid for gas which it purchased in two specific "areas"—the "South Louisiana Area" and the "Jackson Area"—instead of all of the "areas" in which United was purchasing gas.

The amendment specified that the price of gas sold by United to MP & L would be based upon United's "weighted average purchase price of gas" [WAPOG] for the preceding month in the Jackson Area.[3] That "weighted average purchase price of gas in the Jackson Area" would be derived by:

(1) adding together all the volumes of gas which Seller purchased in the area and transferred into the area during the preceding billing month;

(2) adding together the cost payable by Seller for the gas it purchased in the area and the cost assignable to the gas transferred into the area during the preceding billing month; and

(3) dividing the total of said costs payable by the total of said volumes purchased in and transferred into the area. The resulting quotient shall be the weighted average purchase price of gas in the area.

The 1969 Amendment then stated:

(a) Subject to the provisions of paragraph (b) hereof, the cost of gas purchased by Seller shall be the amount payable by Seller to the producer, pipeline or other seller ....

The 1969 Amendment allowed one other item of cost to be included for certain United purchases of gas in the Gulf of Mexico, namely, the cost of delivering that gas onshore from the Gulf of Mexico:

... the cost of gas purchased on the seaward side of the shorelines of Florida, Alabama, Mississippi, Louisiana, and Texas ... shall be the amount payable to the producer, pipeline or other seller thereof, plus the amount, if any, payable by Seller to others for delivery of the gas onshore....

Thus, for Gulf of Mexico gas whose cost United could include in the MP & L price computation, United could include both the purchase price and the amount paid to others to deliver that gas to shore.

Next, the Amendment provided that the "cost assignable to gas transferred into the Jackson Area," which was one element of the "Seller's weighted average purchase price of gas in the Jackson Area," was to be the average price paid by United for gas which it *purchased* in only *one specific area*, the "South Louisiana Area" as depicted on the map incorporated into that Amendment, or which was purchased by United in the Gulf of Mexico and delivered onshore in the "South Louisiana Area":

(c) Cost assignable to gas transferred into the Jackson Area shall be the result obtained by multiplying the weighted average price paid by Seller for gas purchased in its South Louisiana Area, as outlined in Exhibit B (Drawing UB21566 1-1-69) attached hereto, and in the Gulf of Mexico for delivery onshore in the South Louisiana Area, by the volume of gas transferred into the Jackson Area.

Finally, the Amendment provided that, for purposes of this computation, the cost of gas purchased by United also would include all taxes which would be levied on that gas at any time prior to the receipt of that gas by Seller "in its Main Pipe Line System."

In summary, the Amendment based the price of gas to MP & L on the purchase price paid by United for gas which it purchased in the "South Louisiana Area" and in its "Jackson Area." United and MP & L in this amended Article XIV made one exception for gas which was purchased outside of either of these areas, and that exception was keyed to one of those two defined areas. Under the exception, allowable costs for gas purchased by United in the Gulf of Mexico—namely, the purchase price and the cost of getting that Gulf gas onshore—could be included in the calcula-

---

**3.** The parties have abbreviated the term "weighted average purchase price of gas" as both WA-POG and WACOG. The terms are used interchangeably and mean virtually the same thing.

tion of the MP & L WAPOG if that gas came onshore in the South Louisiana Area.

## EXCHANGE AGREEMENT

James Haynes, Executive Vice President of United, testified that United did not know in 1969 it was going to be buying gas on land outside of its existing districts, and that there was no specific provision in the amendment that would allow United to include in the MP & L WAPOG calculations gas that it purchased on land outside of the areas designated on the map attached to the amendment (Exh. P–3 (Haynes Dep.), 146–47). Other than gas purchased in the Gulf of Mexico, United did not begin to purchase gas from outside its existing "areas" until the mid-1970's (Exh. P–3 (Haynes Dep.), 109–112), when it began to include such purchases in rates billed to MP & L. (United's Answer, para. 31).

There is no evidence that anyone at United told MP & L, at any time before February 28, 1979, that United was including or intended to include in the price of gas to MP & L any costs for gas purchased outside the areas specified in the contract. Mr. Norris Stampley of MP & L testified that MP & L was not told this information even during a February 28, 1979 meeting with Mr. James Haynes, when United unsuccessfully sought to amend Article XIV.[4] By the time of that meeting, United already had committed itself to both the purchase of the Canadian gas and the exchange of that gas with Northern Natural. (Exh. P–3 (Haynes Dep.), 163–66; Exh. P–4 (Bourque Dep.), 127–28, 224). The monthly invoices sent by United to MP & L for gas purchases under the Agreement do not indicate where United has purchased the gas (see Exh. P–14).

Under its agreement with Northwest Alaskan Pipe Line Company, United has agreed to purchase 450,000 mcf per day. The gas is purchased at the Canadian border and transported from there to Ventura, Iowa, by Northern Border Pipe Line Company and there delivered to Northern Natural Gas Pipe Line Company. United owns a 12¼% equity interest in Northern Border Pipe Line Company (Exh. D–35 (Smith Dep.), 24) but is obligated to pay approximately 40% of the cost involved in the operation of the pipe line, based upon an allocation of capacity of the pipe line (Exh. D–35 (Smith Dep.), 18).

Pursuant to an Exchange Agreement with Northern Natural Gas Pipe Line Company, United obtains equivalent volumes of gas delivered by Northern Natural to delivery points designated by United in Louisiana, Mississippi and Texas. The Canadian gas began to flow through the Northern Border Pipe Line in September 1982 (Exh. D–35 (Smith Dep.), 23–24).

The testimony reveals that the Canadian gas is the most expensive gas in United's System.[5] Exhibit P–23 reflects not only a significant difference between the cost of the Canadian gas and the North High Island gas but also the very large transportation charges incurred by United in delivering the Canadian gas to Northern Natural, which transportation charges are being included in rates billed to MP & L.[6]

---

**4.** United contracted to purchase Canadian gas from Northwest Alaskan Pipe Line Company in 1978 and in February 1979 sought to amend the Agreement so that rates billed to MP & L would be calculated on a system-wide basis rather than on a limited geographic basis as provided in the 1969 amendment. MP & L did not agree to the proposed amendment.

**5.** The difference between the cost of Canadian gas and the cost of Jackson Area and South Louisiana Area gas is depicted on Exhibit P–34. For the period September 1982 through July 1983 the cost of Canadian gas exceeded the cost of Jackson Area gas by as much as $7.5480 per mcf and exceeded the cost of South Louisiana

Area gas by as much as $9.0569 per mcf. The difference between the cost of Canadian gas and North High Island gas produced in the Gulf of Mexico is also illustrated in Exhibit P–23. The North High Island gas is being delivered onshore in the South Louisiana Area but is excluded in calculating rates billed to MP & L. However, the transportation charges incurred by United in delivering that gas are included in rates billed to MP & L.

**6.** For example, in May 1983 the transportation cost associated with the Canadian gas was $5.92 per mcf compared with $.55 per mcf for transporting the North High Island gas from the Gulf of Mexico to the South Louisiana Area. The

## MP & L'S AUDIT

Pursuant to a provision in the Agreement,[7] MP & L requested an audit of United's books and records in the summer of 1982. MP & L alleged they had learned that the Canadian gas United had contracted to purchase was expected to start flowing in the near future, and MP & L wanted to make certain that United was not including the cost of the Canadian gas in United's calculation of MP & L's rates.

MP & L commenced its audit of United in September 1982. The audit revealed that United was including the cost of Canadian gas and associated transportation charges in rates billed to MP & L. The audit also revealed that United had included the cost of gas purchased in Utah, Colorado, Wyoming, New Mexico, Oklahoma, Texas, Kansas and in that part of southwest Louisiana outside of the South Louisiana Area, in the calculation of rates billed to MP & L. According to MP & L, the audit specifically revealed that United had included, in calculating rates billed to MP & L, gas purchases made outside of the areas specified in the agreement totalling 219,061,303 mcf of gas at a cost of $705,567,841 for the period October 1976 through January 1983 and 27,736,181 mcf at a cost of $205,518,076 for the period February 1983 through August 1983 (Exh. P–21). MP & L's auditors also claimed that United was including other costs not allowed under the Agreement in rates billed to MP & L. They were of the opinion that for the period October 1976 through August 1983 United had overbilled MP & L more than $44,000,000.00, before calculation of any interest (Exh. P–16A at p. 42 and Exh. P–21). MP & L complained to United about these billing practices, de-

manded that they be discontinued, and requested a refund of all overcharges.

United agreed to refund overcharges relating to the use of an incorrect pressure base for which it made refunds to MP & L on October 29, 1982 and December 15, 1982 totalling $2,924,643.26. It also made refunds totalling $111,784.50 for overcharges relating to the improper calculation of volumes of gas sold to MP & L and made a partial refund totalling $836,270.87 for overcharges in 1979 involving the Natural Gas Policy Act of 1978. (Exh. P–33).

United informed MP & L during the audit that it would assert the six-year statute of limitations [8] and refused to provide MP & L's auditors access to any of United's records prior to September 1976. In order to prevent the statute of limitations from barring further claims, MP & L filed suit. MP & L's auditors issued an audit report on August 9, 1983 which covered the period September 1976 through January 1983. In a supplemental audit report dated October 25, 1983, which brought forward the earlier report and covered the period February through August 1983, MP & L claimed that United had overcharged MP & L $44,182,-219.99 for the period October 1976 through August 1983, and that MP & L was entitled to interest of $5,848,942.66 through September 30, 1983. After deducting refunds made as of September 30, 1983, totalling $3,872,698.63, MP & L's claim as of that date amounted to $46,158,464.02. (Exh. P–16A, p. 42).

At the time of the continuation of the hearing on December 19, 1983, United had made refunds of overcharges to MP & L totalling $11,457,853.76 (Exh. P–33). Further, United noted during the December

---

difference between the total cost of the Canadian gas and the North High Island gas ranged from $3.44 per mcf in September 1982 to $7.91 per mcf in May 1983. While United was contracting in 1978 to purchase Canadian gas and exchange it for gas belonging to Northern Natural, Northern Natural was contracting to purchase gas in the Gulf of Mexico for $2 and $3 per mcf. (*See* Exh. P–25).

7. Article V, paragraph 6 of the Agreement provides:

Access to Billing Data—Buyer and Seller shall have the right to examine the books, records and charts of the other party at all reasonable times to the extent necessary to verify the accuracy of any statement, charge or computation made pursuant to the provisions of any article of this agreement.

8. Mississippi has a six year statute of limitations applicable to claims based upon written contracts. *See* Mis.Code Ann. § 15–1–49 (1972).

hearing that MP & L was due an additional sum of $1,214,621.26 for overcharges made during the period October 1982 to August 1983 relating to the allocation of transportation charges for certain offshore gas, changes in depreciation of certain offshore facilities of United and a change in the figures used in the calculation of MP & L's WAPOG for volumes transferred into the Jackson Area. (Exh. D–36 (Underwood Dep.), 30).

MP & L's auditors have projected overbillings by United to MP & L of $6,583,822 for the period September 1983 through December 1983 (Exh. P–24). MP & L's auditors have further projected an average annual overbilling of $21,144,205 for the years January 1, 1984 through December 31, 1987 (the date on which the current pricing provision expires), assuming that MP & L purchases only the minimum amount of gas under the take-or-pay provision of the contract (34,674,000 mcf per year).[9] Based on these figures, MP & L claims that projected overbilling for the four-year period would be $84,576,820.

## ANALYSIS OF STANDARDS FOR PRELIMINARY INJUNCTION

■ In the Fifth Circuit, *Canal Authority v. Callaway,* 489 F.2d 567 (5th Cir.1974) provides the criteria to be applied in order to determine whether a preliminary injunction should be granted. A plaintiff.is entitled to preliminary injunctive relief when there is a showing that there is:

(1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest.

*Id.* at 572. This Court finds that MP & L and the Commission have met their burden of persuasion on each of these four factors.

1. *Substantial Likelihood of Success on the Merits*

A. *The Contract Terms*

While the pricing provisions of the Agreement are complex, at the present time it appears to the Court that there is a limitation on the charges which may be included in the computation of the price of gas to MP & L. United may include in the computation the purchase price of gas only if that gas is purchased in defined geographical areas—the "South Louisiana Area" and the "Jackson Area." The exception found in the Agreement to this rule is gas purchased in the Gulf of Mexico and delivered onshore in the "South Louisiana Area." Also, the transportation charges which may be included in the computation are those related to bringing Gulf of Mexico gas from offshore to onshore in the South Louisiana Area. The Court with the proof before it presently, can discover no other exceptions in the Agreement for the inclusion of other costs in the computation of the price of gas to MP & L.

It appears from the pricing provisions of the Agreement that the purchase price of gas which United has been purchasing at the Canadian border or in Utah, Wyoming, Colorado, Texas, New Mexico, Oklahoma or Kansas may not be included in that price computation, since this purchase price is not paid for gas which United purchases in one of the areas defined by the Agreement.

It further appears to the Court that the Agreement does not allow United to include in the computation certain transportation charges which United pays to have gas transported from the Canadian border to Ventura, Iowa or which result from oth-

---

**9.** Article XIV, paragraph (1), of the Agreement provides in part:

"It is recognized that upon the completion and placing into operation of Buyer's said new 750,000 KW Unit at said Baxter Wilson Plant, Buyer will purchase a portion of its fuel requirements from other sources. In rec-

ognition thereof, Buyer agrees, effective on the first day of the month following the placing into commercial operation of said new 750,000 KW unit, to take or pay Seller for, whether taken or not, a *minimum annual quantity of gas of* 34,674,000 mcf during any calendar year." (Emphasis added).

er land to land transmissions. Such transportation charges are not paid for bringing Gulf of Mexico gas onshore in the South Louisiana Area.

### B. *United's Canadian Gas Formula*

United has placed the price which it pays for gas purchased at the Canadian border and elsewhere into the MP & L price computation. Evidently, United first began this practice in the fall of 1982, when United began purchasing the Canadian gas.

However, Ms. Phyllis Bourque testified at the hearing that this formula is not found in the Agreement between United and MP & L. Also, United has allegedly changed and revised this formula several times since its implementation in the fall of 1982, including changes in the last bill to MP & L before the hearing began on October 31, 1983.

Ms. Bourque and Mr. Haynes testified that in none of United's many other exchanges does it assign to gas it receives the cost it pays for gas it purchases and delivers, as it does in the exchange with Northern Natural involving Canadian gas. (Exh. P-4 (Bourque Dep.), 85, 87, 88; Exh. P-3 (Haynes Dep.), 204-05). According to Ms. Bourque, United developed a formula for assigning a "price" to this gas because of the "magnitude" of the gas costs in the exchange involving the Canadian gas.

### C. *Transportation Costs*

MP & L urges that the Agreement allows United to include transportation charges only for delivering Gulf of Mexico gas from offshore to onshore in the South Louisiana Area with no land transportation charges includable. United contends that under the Agreement it is allowed to include the cost of gas purchased in the Gulf of Mexico and all associated transportation costs for the delivery of gas onshore into its main pipeline system in the South Louisiana Area, regardless of where the gas is delivered onshore. MP & L maintains that the Agreement, however, does not ascribe to the word "onshore" a meaning other than its ordinary, accepted meaning, and

does not state that it means "onshore in United's Main Pipe Line System." Words employed in a contract will be assigned their ordinary meaning unless it is shown that the parties used them in a different sense. *See, e.g., Owen v. Gerity,* 422 So.2d 284, 288 (Miss.1982); *Continental Casualty Co. v. Hester,* 360 So.2d 695, 697 (Miss. 1978). *Miller v. Fowler,* 200 Miss. 776, 28 So.2d 837, 838 (1947).

In February 1979, almost a year after United had signed a contract to purchase the Canadian gas but before United began taking delivery of that gas, United proposed to MP & L an amendment to the pricing provisions of the MP & L Agreement. (Exh. P-9). The proposed amendment would have allowed United to base the price of gas to MP & L on United's weighted average monthly cost for all gas which United purchased plus transportation charges, regardless of where that gas was purchased. Under this proposed contract, the purchase price and transportation charges of the Canadian gas which United had agreed to purchase, could have been included in the MP & L price calculation. MP & L declined to execute the proposed amendment.

From all of the evidence presented at the hearing on the motion for preliminary injunction, the Court finds that there is a substantial likelihood that MP & L and the Commission will prevail on the merits.

### 2. *Irreparable Injury*

The plaintiffs' evidence demonstrates that there is a substantial likelihood that the injury suffered by the public will be irreparable. The Court finds that the plaintiffs have met their burden of showing a substantial threat of irreparable injury, the second prerequisite of *Canal Authority.*

Lynn Havens, Chairman of the Public Service Commission, testified that the fuel costs of MP & L flow directly through to the customers of MP & L by virtue of MP & L's filed tariffs. These customers are

the real plaintiffs in this case.[10] Commissioner Havens testified that this Court is the last resort to protect the public interest. The Commission has no jurisdiction over United's performance of the Agreement.

Commissioner Havens also stated that refunds made years down the road are not an adequate remedy for the alleged overcharges of United. He was concerned about the adequacy of refunds which can only be obtained after a lengthy trial on the merits and the potential delay occasioned by resort to the appeal process.[11]

But aside from the question of the delay, the Commissioner believes that neither credits to customers' bills nor refunds by check will adequately redress the harm. Commissioner Havens testified that simply issuing credits on future bills will fail to reach those who are no longer customers of MP & L.[12] A refund by check is similarly unacceptable, he stated. The process is enormously expensive, and as with issuing credits, a refund does not repair the harm suffered by customers who have moved, have died or cannot be located for other reasons. Commissioner Havens testified that in a recent refund by MP & L pursuant to a Commission order, the cost of processing checks to MP & L's more than 300,000 customers was in excess of $5 per check. This administrative expense significantly reduced the total amount available to be refunded to MP & L's customers. Moreover, more than 20,000 checks representing a total of over $1 million were returned as undeliverable, even after an

extensive and costly campaign was made to locate through newspaper, television, and radio advertisements those customers to whom a refund was due. Commissioner Havens stated that the Commission must continue to monitor the refund process for years until all efforts to reach missing customers are exhausted and then decide the disposition of the unclaimed refunds.

■ The testimony of Commissioner Havens is supported by case law which holds that refunds are inadequate to remedy the harm caused by excessive rates. *FPC v. Tennessee Gas Transmission Co.*, 371 U.S. 145, 154–55, 83 S.Ct. 211, 216, 9 L.Ed.2d 199 (1962). *See also City of Chicago v. FPC*, 385 F.2d 629, 644 (D.C.Cir.1967), *cert. denied*, 390 U.S. 945, 88 S.Ct. 1028, 19 L.Ed.2d 1133 (1968) (refunds are an inadequate substitute for an immediate rate reduction).

United presented Mr. E.C. Moore as an expert witness to show that United's overcharges have a negligible impact on MP & L's customers. However, Mr. Moore acknowledged that all of the large customers of MP & L were omitted from his analysis. Many of these large customers, including hospitals, schools, and scores of public agencies, provide services to the public. Moreover, Mr. Moore did not measure the impact of United's overcharges on low-income customers. Mr. Jim Schimpf, Director of Rates for MP & L, testified that low income families in Mississippi can and

10. The Commissioner compared United's overbillings to a utility's practice of implementing rates under bond, a practice halted by the 1983 Public Utilities Act. Commissioner Havens testified that the public policy behind the Act is to require judicial scrutiny before rates are implemented.

11. The monthly report of civil cases by the Clerk of the Court for the month of December, 1983 shows that a total of 3,576 civil cases are pending in the Southern District of Mississippi. These are roughly divided among the three district judges such that each judge currently carries approximately 1,200 cases. This District, it should go without saying, is one of the busiest, if not the busiest, per Judge, in the

country. The most recent comparison of work loads in the United States district courts is found in the Federal Court Management Statistics 1983 prepared by the Administrative Office of the United States Courts. The statistics contained in this report contain information through June 30, 1983. At that time the pending civil cases per judge in the Southern District of Mississippi was 1,118. This case load was the highest of any district in the Fifth Circuit or, indeed, the United States or its territories. As of this writing, this Judge has over 1300 pending civil cases.

12. Commissioner Havens testified that there is a 6–7% turnover in MP & L's customers annually.

do consume relatively large amounts of electricity.[13]

In the State of Mississippi the magnitude and effect of the potential harm to MP & L's customers should no injunction be granted and MP & L does eventually prevail on the merits is pervasive. Mississippi has the lowest per capita income of the fifty states. Forty-four of the forty-five counties served by MP & L had an average per capita income of only $6,723 in 1981. This figure is below the already low state average of $7,049.[14]

The impact of the alleged overcharges by United would be exacerbated by its position that it owes no interest on the overcharges, even on those it has admitted. The effect of United's position is that MP & L and its customers could never recover any amount for the use of the money paid in wrongful overcharges. Since the legal rate of interest is well below prevailing rates, the harm to MP & L's customers will not be corrected by a refund out of damages which United is ordered to pay at a future trial on the merits of this case.[15]

One other factor on the issue of irreparable injury must be considered. The testimony of Ms. Bourque raises a question whether United will be able to pay a judgment for overcharges if MP & L and the Commission ultimately succeed on the merits. United's officials testified that United faces enormous potential liability. United's Executive Vice-President, Lamar Smith, testified by deposition that by early December 1983, United's suppliers already had made claims of approximately two hundred million dollars against United under take-or-pay contract provisions. Ms. Bourque said that the potential liability from these claims could grow by domino effect to one billion dollars by the end of 1984.

In addition, United's latest Form 10K reveals that United has potential liabilities through existing curtailment lawsuits of 1.43 billion dollars (Exh. P-10 (dated March 30, 1983), 2, 41). United paid $112 million to one such curtailment claimant in 1982. Moreover, United has stated in its recently amended answer to the curtailment lawsuit brought by MP & L in this Court that a loss of that lawsuit would threaten United's ability to operate as a viable company.[16]

The Court concludes that MP & L and the Commission have sustained their burden of showing a substantial threat of irreparable harm if an injunction is not granted.

### 3. Balance of Hardships

In comparison to the harm to the customers of MP & L and to the economic vitality of the State of Mississippi as a result of United's overcharges, the harm to United should a preliminary injunction issue is minimal and can be readily corrected by damages should United prevail on the merits. At the present time, United can afford the cost of the injunction,[17] and no evidence is before the Court casting doubt upon MP & L's ability to pay damages to United. Commissioner Havens testified that if MP & L is later required to pay the disputed charges to United, MP & L will pass the charges on to its customers at that time.

---

13. See Exh. P-32.

14. See Exhs. P-37 through P-39.

15. Mr. Moore testified that the prevailing rate of interest is 12%.

16. "United further avers that the rendition of a monetary judgment in favor of MP & L would seriously threaten the ability of United to function as a natural gas transmission company ...." United's Second Amended Answer, p. 28

(filed October 21, 1982) in *Mississippi Power & Light Company and State of Mississippi v. United Gas Pipe Line Company and Pennzoil Company,* U.S. District Court, Southern District of Mississippi, CA No. J74-185(R).

17. United has annual revenues exceeding three billion dollars, according to its latest 10K report. In 1982 United paid a $66 million dividend to its parent, United Energy Resources, Inc. Exh. No. P-10 at 35.

It is the opinion of the Court that the balance of hardships·in this case is on the side of the plaintiffs.[18]

### 4. *The Public Interest*

The evidence offered by the Commission and MP & L leáds the Court to a conclusion that a preliminary injunction would protect the interests of the public. Obviously, it is the public who will either pay or benefit from the Court's decision. Indeed, Commissioner Havens testified that relief from this Court represents the only available remedy for the public, since United's performance under the contract is not subject to the Commission's jurisdiction.

Although this case is founded upon a claim for breach òf contract, the involvement of a public interest is particularly important to the considerations which a court of equity weighs:

> [T]he rights of parties are not governed by comparing the pecuniary loss to one party and the benefit to another, where, as here, the rights of the parties are founded in contract and are sufficiently explicit. [citation omitted] If the rights and duties of the parties are fixed by contract, it is not the question of convenience or inconvenience, or the comparative amount of damage or injury resulting from the enforcement of the right. It is the specific performance by the court of that bargain which the parties have made, with their eyes open. [citation omitted] This is especially true, we think, when the contract the parties have made, and which is sought to be enforced, is affected with a public interest.

*West Edmond Hunton Line Unit v. Stanolind Oil & Gas Co.*, 193 F.2d 818, 825 (10th Cir.1951), *cert. denied*, 343 U.S. 920, 72 S.Ct. 678, 96 L.Ed. 1333 (1952).

Were the Court to have any doubt that the plaintiffs have met their burden under *Canal Authority*, the dominant presence of the public interest in this case convinces the Court that a preliminary injunction is warranted.

### STATUS QUO

■ The status quo to be preserved by a preliminary injunction is universally defined as the last uncontested status which preceded the pending controversy. *See, e.g., District 50, United Mine Workers of America v. International Union, United Mine Workers of America*, 412 F.2d 165, 168 (D.C.Cir.1969); *Westinghouse Electric Corp. v. Free Sewing Machine Co.*, 256 F.2d 806, 808 (7th Cir.1958). The Court's decision today will restore that condition.

In United's Answer filed in this cause on May 16, 1983, at paragraph 31, United states the following: "Beginning in the mid-1970's and continuing to date, United has billed to MP & L under the Gas Sales Agreement the cost assignable to gas transferred into the Jackson Area in the manner that MP & L now contends is wrongful, unlawful, and an overcharge." Since the prohibitions sought by MP & L and the Commission focus upon ceasing the overcharges made by United, the Court's decision will restore the state of affairs which existed prior to the time in approximately 1976 when United admits it began the practices which are the subject of this lawsuit.

United's assertion that its billing practices continued until 1982 without protest from MP & L does not argue against restoring the status quo which obtained before those practices began, because MP & L claims it was unaware that United had changed its methods of calculating the cost of gas to MP & L. MP & L's Senior Vice President and Special Assistant to the President, Mr. Norris J. Stampley, testified that no one from United advised him that United had changed its billing practices to in-

---

**18.** Since the balance of hardships is in favor of MP & L and the Commission, the burden of showing a substantial likelihood of success on the merits is correspondingly lighter. *Canal Authority, supra,* at 576.

> [A]lthough a showing that plaintiff will be more severely prejudiced by a denial of the injunction than defendant would be by its grant does not remove ·the need to show some probability of winning on the merits, it does lower the standard that musı̇ be met. 11 C. Wright & A. Miller, Federal Practice and Procedure § 2948, at 455 (1973) (*quoted in Canal Authority, supra,* at 576).

clude the cost of gas purchased in areas outside those specified in the Agreement. Also, in the late summer of 1982, when MP & L attempted to find out from United whether costs associated with the Canadian purchase would be included in MP & L's bills, Burt Bonassin of United said they would not be included.

In *Delaware River Port Authority v. United States Lines, Inc.*, 331 F.Supp. 441 (E.D.Penn.1971), a district court granted a preliminary injunction prohibiting an ocean carrier from continuing to import material bound for the Philadelphia area through some other port, despite the defendant carrier's argument that it had been following the practice for *twenty* years without protest from the plaintiffs. *Id.* at 446. The court found that the plaintiffs had no knowledge of the practice until just before suit was brought. *Id.* at 447. Hence the court found that the status quo to be maintained pending a final determination of the merits of the claim was that which existed prior to the carrier's alleged illegal practices. *Id.* at 447–48.

The parties to this lawsuit are in a similar situation. If MP & L did not learn of the United practices which are now in dispute until the audit of late 1982 which led to this suit, and the Commission did not learn of them until the lawsuit commenced, it is proper for this Court to frame a preliminary injunction to restore the status quo which existed between MP & L and United in the mid-1970's immediately prior to the time United admits it changed its billing practices.

### CONCLUSION

For the reasons stated above, the Court will approve an order granting the Commission and MP & L a preliminary injunction

(1) enjoining United from including in the calculation of rates billable to MP & L

(a) the cost of gas and associated transportation charges for Canadian gas and other purchases made outside of the Jackson Area, the South Louisiana Area or the Gulf of Mexico for delivery onshore in the South Louisiana Area;

(b) the cost of gas and associated transportation charges for gas purchased by United in the Gulf of Mexico and delivered onshore outside of the South Louisiana Area; and

(c) transportation charges incurred by United for transporting gas from one point on land to another point on land.

The Court will entertain argument on the appropriate amount of the requisite bond.

An order in accordance with the foregoing opinion of the Court shall be submitted as set forth in the Local Rules.